DECISION
Plaintiffs appeal the 2008-09 real market value of their property identified as Account 0099794. A telephone trial was held September 3, 2009. David Carmichael, Attorney at Law, appeared on behalf of Plaintiffs. Paul Anderson (Plaintiff) testified. Bryce Krehbiel (Krehbiel), Residential Appraiser, appeared and testified on behalf of Defendant.
Plaintiffs' Exhibits 1-1 through 1-15 and Defendant's Exhibits A through O were received without objection. Plaintiffs' rebuttal evidence (Exhibits 2 through 7) was received September 4, 2009, without objection.
 I. STATEMENT OF FACTS
The subject property is a 2,722 square foot, 3 bedroom, 2 bath single family residence completed in November 2007 and located on 3.81 acres in rural Springfield, Oregon. (Ptfs' Ex 1-8; 1-9 1-12.)[1] Plaintiff testified that Plaintiffs purchased the subject property in August 2006, paying $242,500 cash. The property was listed for $265,000, and the improvements were a 1998 Skyline manufactured structure with a detached shop and greenhouse. (Ptfs' Ex 1-6; Def's Ex F.) Plaintiff testified that, prior to finalizing the purchase of the subject property, they *Page 2 
contracted for a second well. Plaintiff testified that they spent approximately $5,000 to drill a well at a location closer to the home they planned to build on the subject property. When Plaintiff received a report entitled "Analysis Report, Water Quality Indicator Tests" (Report), dated August 7, 2006, Plaintiff testified that he believed that the reported arsenic result was within the "allowable federal contaminable level." (Def's Ex J.) According to the Report, the "MCL" (maximum contaminable level) is 0.01 and the reported result was 0.0449. (Id.) Plaintiff testified that he became aware of the federal acceptable arsenic contamination level about "two to three months after purchase." When asked if he considered drilling a third well, Plaintiff responded that he did not, but that he did look into "other ways to cure" the arsenic contamination. Plaintiff testified that the alternatives "were extremely costly" and he "got one $18,000 quote" but no "guarantee" that "it would eliminate the arsenic."
Plaintiff testified that he sold the Skyline manufactured structure for $25,000, prior to beginning construction of his residence in March 2008. During the time the residence was under construction, Plaintiff put a for sale sign in his front yard, listing an offering price of $385,000. Plaintiff stated that he had sold three other homes he owned without professional realtors to "keep his costs down," and because, of the arsenic contamination, he hoped to sell the property and "get out with the shirt on his back." He testified that, once the arsenic contamination was disclosed to a potential buyer, no one was interested in buying his property. Plaintiff testified that his family drinks and cooks with bottled water. He testified that his residence was completed in November 2007, for a total cost of $160,250.
The 2008-09 subject property's real market value on the tax roll is $560,228. (Def's Ex A.) Plaintiffs allege that the real market value of their property is not less than $382,500 and not more than $435,000. Plaintiffs presented three comparable sales, noting that none of those *Page 3 
sales report arsenic contamination in the water. Sale 1 is a 2,548 square foot, 3 bedroom, 3 bath single family residence built in 1976 and located on 1.42 acres in Springfield. (Ptfs' Ex 1-13.) Plaintiff testified that Sale 1 is approximately two miles from the subject property.[2] The sale date was November 19, 2007, and the sale price was $397,000, or $155 per square foot. (Id.) Sale 2 is a 2,336 square foot 4 bedroom, 3 bath single family residence built in 1971 and located on 3.14 acres in Springfield. (Ptfs' Ex 1-14.) Plaintiff testified that Sale 2 is approximately four miles from his home and the sale price was $390,000, or $166 per square foot. (Id.) Sale 3 is a 2,406 square, 3 bedroom, 2 bath single family residence built in 2007 and located on 1.56 acres in Springfield. (Ptfs' Ex 1-15.) Plaintiff testified that he is most "familiar with this property" and concludes "it is most like his home," reporting a May 2007 sale price of $235,000, or $97 per square foot. (Id.)
Krehbiel discussed four class 4 properties that he concluded are most comparable to the subject property. (Def's Exs L; M; N; and O.) His first comparable property was a 2,828 square foot, 3 bedroom, 2 bath single family residence built in 1998 and located on a 2.49 acre parcel in Cottage Grove. (Def's Ex L.) That property sold in August 2007, for $545,000, or $193 per square foot. (Id.) The property description states that it is a "MAGNIFICENT CUSTOM HOME IN RIVERVIEW ESTATES." (Id.) Krehbiel's second comparable property was a 2,594 square feet, 3 bedroom, 2.1 bath single family residence built in 2001 and located on 4.81 acres in Eugene, Oregon. (Def's Ex M.) That property sold in September 2008 for $525,000, or $202 per square foot. (Id.) The property description states that it is "FABULOUS CLOSE IN COUNTRY ESTATE" with "[o]ver $15K in recent upgrades including granite and stainless steel * * * landscaped and includes 8ft deep chlorinated water feature that is the perfect place to *Page 4 
swim in the summer!" (Id.) Plaintiff testified that that property is 32 to 40 miles from his property and he did some work at this property.[3]
He concluded that it is not like his home because that property has a 150 yard asphalt driveway and his driveway is gravel. Krehbiel's third comparable property was a 2,806 square feet, 3 bedroom, 2.1 bath single family residence built in approximately 2005 and located on 4.22 acres in Cheshire, Oregon. (Def's Ex N.) The property sold in June 2008, for $490, 000, or $175 per square foot. (Id.) The property description states that this is a "[g]orgeous custom built home located on a secluded mountain side w[ith] amazing views, * * * Granite, Travertine, Bamboo floors, honed copper slate tile floors, Chinquapin logs, Ash cabinets, exposed beam ceilings, open island kitchen * * *." (Id.) Krehbiel's fourth comparable property was a 2,814 square feet, 4 bedroom, 2 bath single family residence built in 2007 and located on 1.66 acres in Junction City, Oregon. (Def's Ex O.) That property sold in September 2007, for $486,000, or $173 per square foot. (Id.) That property's listed features included "Cherry wood floors, Granite counters, travertine floors[,] * * * [and] cultured Stone on the exterior." (Id.) Krehbiel testified that he had not visited any of the properties he selected as comparable to the subject property; nor had he visited the subject property. He concluded that his third and fourth comparable properties were the most like the subject property because they are "rural properties" at the "lower end." Plaintiff disputed Krehbiel's statement about comparability, testifying that his property has carpet and vinyl flooring and his kitchen counter is concrete. *Page 5 
 II. ANALYSIS
At issue in this case is the subject property's real market value for tax year 2008-09. Real market value is defined in ORS 308.205(1)[4]
which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
There are three methods used to determine real market value: (1) the cost approach, (2) the income capitalization approach, and (3) the market approach (comparable sales). Allen v. Dept. of Rev, 17 OTR 248, 252
(2003). See also OAR 150-308.205-(A)(2) (stating that all three approaches to valuation of real property must be considered, although all three may not be applicable to the valuation of the subject property). The parties agree that the income approach is not applicable to the subject property.
A. Comparable Sales Approach
Both parties valued the subject property using the comparable sales approach. Neither party adjusted the sale price of their comparable properties for date of sale, age, location, special features, land size, or living square footage. Defendant selected some properties located more than 30 miles from the subject property, and Defendant failed to show how the locations were similar. (Def's Exs L; M; N; and O; Ptfs' Ex 6.) Even though Defendant's comparable properties were comparable in total living square footage, many of the residences possessed features not found in the subject property; Defendant made no adjustments to the sale prices. (Def's Exs L; M; and N.) Some of Defendant's comparable property improvements were located on much smaller acreage than Plaintiffs'; Defendant did not adjust for the size difference or explain why an adjustment was not required. (Ptfs' Exs 1-13; 1-15 and Def's Exs L; O.) One of *Page 6 
Defendant's comparable sales, located on Pickens Road in Eugene, Oregon, is surrounded by timber. (Ptfs' Ex 4.) Defendant did not discuss the timber or its value, if any. Two of Plaintiffs' three comparable properties were built 30 or more years prior to the subject property; Plaintiffs did not adjust for the significant difference in age of the properties. (Ptfs' Exs 1-13; 1-14.) Unadjusted sale prices of properties labeled comparable but having significant differences to the subject property are not persuasive evidence of the subject property's real market value.
B. Cost Approach
The cost approach is particularly useful in estimating the real market value of new construction because cost and market value can be more closely related when properties are new. The cost approach separates land and improvement values often used for new construction. Plaintiffs purchased the subject property in August 2006 for $242,500. The "reassessed" land real market value on the tax roll as of January 2008 was $185,038. (Defs' Ex A.) The trended real market value of land as of January 2008 was $178,135. (Id.) Defendant did not offer an explanation for how the "reassessed" land value was determined. Plaintiffs stated that they are not appealing the reassessed land real market value.
Plaintiffs are only appealing the improvement value which was "reassessed" to be $375,190. (Id.) Plaintiff testified that the total cost of his new residence which was completed less than two months prior to the assessment date was $160,250. Plaintiff provided the court with Liberty Bank's "Construction Draw Report" and disbursement payment record; the total amount disbursed was $157,404.98 and the total remaining was $3,095.02, for a combined total of $160,500. (Ptfs' Ex 7 at 4.) The $250 difference was unexplained. In addition, Plaintiff testified that he spent approximately $5,000 to drill a second well. He also testified that he sold the manufactured structure that was on the subject property at the time of his purchase for *Page 7 
$25,000. The net of Plaintiffs' out of pocket costs and receipt from sale of the manufactured structure is $140,500.
Using Plaintiffs' cost approach, the total cost, land and improvements, would be $325,538. That amount does not include the cost of the 20 foot by 20 foot greenhouse, additional 24 foot by 24 foot garage ("large detached shop"), decking, and Koi pond. (Def's Exs E; F.) The parties did not provide evidence of the real market value of any of those structures and feature listed above. Plaintiffs' cost approach is an incomplete determination of real market value.
C. "No immediate market value." ORS 308.205(2)(c).
Plaintiffs urge the court to consider an alternate approach, citing ORS308.205(2)(c) which states:
 "If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property."
Plaintiffs allege that, based on their "for sale by owner" attempt to sell the subject property in June 2008, and the level of arsenic in their water, the subject property "has no immediate market." There is no dispute that, as of August 2006, the reported level of arsenic in their water was above the legal limit. (Ptfs' Ex 1-4.) Plaintiffs did not submit a similar report for the current assessment year; there was no evidence submitted that the arsenic level increased or decreased since the date of the last test, August 2006, and the court has no evidence of the arsenic level as of the assessment date. The court is not convinced that Plaintiffs have sufficiently marketed the subject property to support their conclusion that the subject property "has no immediate market value" as required by ORS 308.205(2)(c). Plaintiff testified that he placed a for sale sign in his front yard but did no other advertising; he did not indicate the length of time of the property was marketed nor the number and identity of those he referred to as *Page 8 
potential buyers. The court concludes that Plaintiffs failed to adequately prove that the subject property "has no immediate market value."
D. Jurisdiction to determine value.
ORS 305.412 provides that
 "[w]hen the determination of real market value * * * is an issue before the tax court, the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties."
Plaintiffs' evidence submitted in support of comparable sales and cost approach persuades the court that the tax roll value is incorrect. Defendant's evidence does not support the tax roll value.[5]
Plaintiffs' evidence provides the court with data sufficient to determine real market value as of the assessment date. Because the assessment date is close to the completion date of the improvement (the single family residence), the cost approach is the best method. Plaintiffs' total cost including original purchase price, 2007 improvement, well, and disposal of 1998 manufactured structure was $383,000 (rounded). Plaintiff testified that Plaintiffs are not appealing the land real market value of $185,038 on the 2008-09 tax roll. The land real market value at the date of purchase was $132,425. Because Plaintiffs accept the land real market value on the tax roll, the $383,000 cost amount must be adjusted for the reassessed land real market value from the date of the original purchase until the assessment date. After the land reassessment, the total real market value of the subject property is $435,613 as of the January 1, 2008, assessment date. The difference between the 2008-09 total real market value, $435,613, *Page 9 
and the land real market value, $185,038, is the real market value of improvements or $250,575. The exception real market value is $160,500. Plaintiffs suggested that the maximum assessed value may be overstated because that value may not have been properly adjusted when the manufactured structure was removed. Plaintiffs submitted no evidence to support their statement. The court makes no adjustment to maximum assessed value for the manufactured structure.
 III. CONCLUSION
After careful review of the testimony and evidence, the court concludes that the subject property's real market value is incorrectly stated on the 2008-09 tax roll. Now, therefore,
IT IS THE DECISION OF THIS COURT that the real market value of the subject property identified as Account 0099794 for the tax year 2008-09 is $435,613; and
IT IS FURTHER DECIDED that the exception real market value is $160,500 for tax year 2008-09.
Dated this ___ day of November 2009.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanner onNovember 17, 2009. The Court filed and entered this document on November17, 2009.
[1] Ptfs' Ex 1-11 states the subject property is 3.72 acres.
[2] Plaintiffs' rebuttal evidence (Exhibit 5) states that the property is located approximately 12 miles from the subject property.
[3] Plaintiffs' rebuttal evidence (Ptfs' Exh 6 at 3) states that the property is located approximately 32 miles from the subject property.
[4] All references to the Oregon Revised Statues (ORS) and Oregon Administrative Rules (OAR) are to 2007.
[5] ORS 305.427:
 "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."